IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

|  |  |
|---|---|
| BRIAN P. JONES, | Civil No. 07-1884-AMD |
| Plaintiff, | |
| v. | |
| DANDREA CONSTRUCTION CO., INC. and GREYHAWK NORTH AMERICA, L.L.C., | **OPINION** |
| Defendants. | |

**APPEARANCES:**

Arthur Mark Krawitz, Esq.
Doroshow Pasquale Krawitz & Bhaya
1202 Kirkwood Highway
Wilmington, DE 19805
        *Counsel for Plaintiff*

Jeffrey Allen Krawitz, Esq.
Silverman, Berns, Kasmen & Krawitz, Esqs.
Sentry Office Plaza
216 Haddon Avenue, Suite 704
Westmont, NJ 08108
        *Counsel for Plaintiff*

Jeanine D. Clark, Esq.
Margolis Edelstein
216 Haddon Avenue
P.O. Box 92222
Westmont, NJ 08108
        *Counsel for Defendant, Dandrea*
        *Construction Co., Inc.*

Christopher J. Conover, Esq.
Ahmuty, Demers & McManus, Esqs.
65 Madison Avenue
Suite 100
Morristown, NJ 07960
        *Counsel for Defendant, Greyhawk*
        *North America, L.L.C.*

**DONIO, MAGISTRATE JUDGE:**

Presently pending before the Court are the motions for summary judgment filed by Defendants Dandrea Construction Co., Inc. (hereinafter, "Dandrea") and Greyhawk North America, L.L.C. (hereinafter, "Greyhawk").[1] This action arises out of an incident in which Plaintiff, Brian Jones, fell from a roof while performing construction work at the Jeffrey Clark School in Mickleton, New Jersey. Subject matter jurisdiction is premised upon 28 U.S.C. § 1332 and is based upon diversity of citizenship of the parties and the amount in controversy allegedly exceeding $75,000. For the reasons set forth below, the Court denies both motions for summary judgment.

Plaintiff filed a complaint on April 23, 2007 alleging that on or about June 16, 2005, he was employed as a commercial steel worker for R.C. Fabricators, Inc. (hereinafter, "R.C. Fabricators") installing a roof on an addition to the Jeffrey Clark School. (Compl. ¶ 10.) Plaintiff contends that the work site "was under the management and/or control" of Defendants Dandrea and Greyhawk at the time of the accident. (Id. at ¶¶ 13, 17.) Plaintiff avers that Defendants Dandrea and Greyhawk owed a duty to "those persons engaged in the performance of the construction work, including the plaintiff, to provide a reasonably safe environment, free from

---

1. The parties consented to this Court's jurisdiction pursuant to 28 U.S.C. § 636(c)(1), FED. R. CIV. P. 73(b), and Rule 73.1 of the Local Civil Rules for the United States District Court, District of New Jersey.

2

unreasonable hazards, within which to perform the construction work." (Id. at ¶¶ 14, 18.)   Plaintiff further avers that a proximate cause of his accident was the negligence of Defendants, including, inter alia, Defendants' alleged failure to "properly supervise safety at the work-site," "implement, monitor and enforce the project's safety rules," or "provide an adequate fall protection system for workers at the construction site[.]" (Id. at ¶¶ 15, 19.)   Plaintiff alleges that as a result of Defendants' purported negligence, Plaintiff sustained temporary and permanent personal injuries, including, but not limited to, "bilateral heel fractures." (Id. at ¶ 29.)   Plaintiff has purportedly required surgery and placement of screws into both heels as a result of the fall. (Id. at ¶ 30.)

The following facts are not in dispute.[2]   In 2004, the East Greenwich Township Board of Education (hereinafter, "East Greenwich") entered into agreements with a number of contractors

---

2.   Pursuant to Local Civil Rule 56.1(a), a party moving for summary judgment must provide a statement setting forth "material facts as to which there does not exist a genuine issue[.]"  L. Civ. R. 56.1(a).  The opponent of summary judgment "shall furnish, with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion[.]"  Id.  "[A]ny material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion." Id.  The opponent "may also furnish a supplemental statement of disputed material facts . . . if necessary to substantiate the factual basis for opposition."  Id.  In this case, Plaintiff did not file a responsive statement addressing each paragraph of Defendants' statements of material facts.  Rather, Plaintiff submitted his own statement of material facts in response to each summary judgment motion.

for a project involving additions and renovations to the Jeffrey
Clark and Samuel Mickle Schools. (See Notice of Mot. for Summ. J.
on Behalf of Def. Dandrea Construction Co., Inc. [Doc. No. 22]
(hereinafter, "Dandrea Mot."), Exs. C, E.)  Pursuant to a standard
form of agreement between owner and construction manager, Defendant
Greyhawk entered into a contract with East Greenwich to serve as
the construction manager for the project. (Dandrea Mot., Ex. F.)
Defendant Dandrea entered into a contract with East Greenwich to
serve as the contractor for the general construction for the
project. (Pl.'s Br. in Opp. to Mot. for Summ. J. of Def. Dandrea
Construction Co., Inc. [Doc. No. 35] (hereinafter, "Pl. Br. [Doc.
No. 35]") 5 ¶ 3; Def., Dandrea Construction Co., Inc.'s Br. and
Reply to Pl.'s Opp. to Mot. for Summ. J. [Doc. No. 41] 1 ¶ 3.)
R.C. Fabricators, Plaintiff's employer, entered into a separate
contract with East Greenwich to serve as the contractor for sheet
metal and steel erection. (Br. in Supp. of Mot. for Summ. J. on
Behalf of Def., Dandrea Construction Co., Inc. [Doc. No. 24]
(hereinafter, "Dandrea Br.") 2 ¶ 3; see also Dandrea Mot., Ex. C.)

The contracts between East Greenwich and Dandrea, and East
Greenwich and R.C. Fabricators are a standard form of agreement
between owner and contractor, AIA document A101-1997. (Dandrea
Mot., Exs. C, E.) Section 8.1.2 of the contracts incorporates
General Conditions of the Contract for Construction, AIA document
A201/CMa-1992 (hereinafter, "General Conditions"). (Id.)[3]

_____
3. The contract between East Greenwich and Dandrea states that
the "1997 edition of the General Conditions of the Contract for

Relevant to Dandrea's motion for summary judgment is Article 10 of the General Conditions, which concerns the "Protection of Persons and Property." (Dandrea Mot., Ex. G; Decl. of Randi A. Wolf, Esquire, in Opp. to Summ. J. Mot. of Def. Dandrea Construction Co., Inc. [Doc. No. 35-2] (hereinafter, "Wolf Decl."), Ex. E.) Section 10.2 specifically addresses the safety of persons and property, and provides:

> 10.2.1    The Contractor shall take reasonable precautions for safety of, and shall provide reasonable protection to prevent damage, injury or loss to:
>
>     .1 employees on the Work and other persons who may be affected thereby[.] . . .

(Dandrea Mot., Ex. G.) The General Conditions also incorporate the provisions of Addendum No. 2, which state in part:

> 1.   Each Contractor must fully comply with the job safety requirements in addition to all Federal, State and Local safety guidelines. . . .
>
> 2.   The Contractor for General Construction (General Contractor) will serve as the overall Project Safety Coordinator and shall be responsible for all issues of safety and protection. Each Prime Contractor shall also designate a safety person at the job site . . . [who] shall be responsible for the safety of their work and for their workers and to make continuous inspections for all safety issues

_____

Construction" is incorporated, but refers to AIA document A201/CMa-1992, which is the 1992 edition of the General Conditions. (See Dandrea Mot., Exs. E, G.) The parties do not appear to dispute that the contract was intended to incorporate the 1992 edition of the General Conditions rather than the 1997 edition. (See Dandrea Br. 3 ¶ 8; Dandrea Mot., Ex. G; Pl. Br. [Doc. No. 35] 6 ¶ 8; Decl. of Randi A. Wolf, Esquire in Opp. to Summ. J. Mot. of Def. Dandrea Construction Co., Inc. [Doc. No. 35-2], Ex. E.)

relating to his work. . . .

(Wolf Decl., Ex. E.)   Addendum No. 2 also provides that "[t]he General Contractor shall be responsible for the immediate investigation and resolution of all safety and environmental complaints/issues generated by Contractor employees, Owners, Owner's representatives or members of the public."  (Id.)

The contract between East Greenwich and Greyhawk is a Standard Form of Agreement Between Owner and Construction Manager, AIA Document B801/CMa.  (Decl. of Randi A. Wolf, Esquire, in Opp. to Mot. of Defs. Greyhawk North America, L.L.C., Greyhawk Construction Corp. and Greyhawk Construction for Summ. J. [Doc. No. 34-2] (hereinafter, "Wolf Decl. II"), Ex. B.)  The scope of Greyhawk's services is set forth in "Attachment A," which states that Greyhawk "agree[s] to perform the scope of services outlined in your Request for Proposal."  (Id.)  "Attachment A" then sets forth a summary of Greyhawk's "typical services," which include "[s]afety requirements to be built into project," "[p]rofessional full-time on-site management" and "[m]onitoring of contractor's safety practices[.]" (Id.)[4]  The services provided by Greyhawk were also outlined during a Preconstruction Meeting on October 28, 2004.   The Project

---

4.   No party has attached the Request for Proposal to the motion papers, and the parties appear to rely only on the "typical services" set forth in "Attachment A" in defining the scope of Greyhawk's contractual duties.  In fact, the expert report submitted by Greyhawk states that the "scope of work was specifically delineated in . . . Attachment A," and Greyhawk's expert relies on the "typical services" set forth in "Attachment A" in defining Greyhawk's contractual duties.  (Greyhawk's Letter Reply Br. dated Feb. 2, 2009 [Doc. No. 42], Ex. A (Report of Johann F. Szautner, P.E. dated January 5, 2009) 6, 8.)

Manager's Report of the Preconstruction Meeting states that "Greyhawk . . . [has] no responsibility to provide for the safety or protection of the trades." (Wolf Decl. II, Ex. D, Section 1.22.) The Report further indicates that "[e]ach Contractor is responsible for safety as defined in the General Conditions" and that "[a]lthough Greyhawk is not responsible for site safety, if we realize an unsafe condition exists [the Contractors] will be notified and required to correct the condition." (Id.) Additionally, Addendum No. 2 to the General Conditions of the contracts between East Greenwich and Dandrea, and East Greenwich and R.C. Fabricators provides that "[t]he Owner and their representatives, including, but not limited to the Architect and Greyhawk are not responsible for safety on this project but will endeavor to promote safety." (Wolf Decl., Ex. E.)[5] Similarly, Greyhawk's construction manager, James Lauria, provided deposition testimony that Greyhawk was not "responsible to enforce safety or produce the means and methods to provide that safety" as each contractor was "solely responsible for enforcing and providing for their safety plan, not Greyhawk." (Decl. of Peter J. Kurdock, Esq. [Doc. No. 23-3] (hereinafter, "Kurdock Decl."), Ex. E (Lauria Deposition Transcript) 13:25-14:9.)

As noted supra, Plaintiff's claims in this case are based on Defendants' alleged failure to ensure Plaintiff's safety at the

_____

5. Addendum No. 2 also requires each prime contractor to submit to Greyhawk for review a site specific written safety plan that complies with the Occupational Health and Safety Act. (Id.)

7

project site.  The accident at issue occurred while Plaintiff and
a co-worker were installing corrugated metal decking sheets on the
roof of an addition to the Jeffrey Clark school.  (Dandrea Br. 4 ¶
11; Pl. Br. [Doc. No. 35] 11.)  The area of the roof that Plaintiff
was installing was adjacent to a flat roof of an existing school
building.  (Dandrea Br. 4-5 ¶ 11; Pl. Br. [Doc. No. 35] 11-12.)
While maneuvering a sheet of corrugated metal, Plaintiff stepped
onto the flat roof of the existing school building.  (Dandrea Br.
5 ¶ 12; Pl. Br. [Doc. No. 35] 12.)  The flat roof of the existing
school building was approximately twelve feet, six inches above the
ground.  (Dandrea Mot., Ex. Q (Report of James A. Parr, P.E. dated
Nov. 24, 2008 (hereinafter, "Parr Report")) 5; Wolf Decl., Ex. I
(Report of Kathleen V. Hopkins R.N., CSSM dated Oct. 31, 2008
(hereinafter, "Hopkins Report")) 3; see also Greyhawk's Letter
Reply Br. dated Feb. 2, 2009 [Doc. No. 42], Ex. A (Report of Johann
F. Szautner, P.E. dated Jan. 5, 2009 (hereinafter, "Szautner
Report") 3.)  Plaintiff was therefore working at a height of less
than fifteen feet when on the flat roof of the existing building.
(Dandrea Br. 15 ¶ 55.)  As Plaintiff was backing up, he stepped off
of the flat roof of the existing school building and fell to the
ground.  (Dandrea Br. 5 ¶ 13; Pl. Br. [Doc. No. 35] 12.)

There is no dispute that Plaintiff had been "tied-off" or
"anchored" to a retractable lifeline for fall protection while
working, but he unhooked his lanyard from the retractable life line
at some point prior to his fall.  (Dandrea Br. 6 ¶¶ 15-16; Pl. Br.

[Doc. No. 35] 12.)    Plaintiff maintains that he unhooked his lanyard because he could not have remained "tied-off" while also maneuvering the corrugated metal sheet.  (Dandrea Br. 6 ¶ 16; Pl. Br. [Doc. No. 35] 12.)    Plaintiff testified that prior to his accident, he never had any safety issues or concerns about the project.  (Dandrea Br. 6 ¶ 17.)   R.C. Fabricators' foreman for the project, Robert Cornish, testified that prior to Plaintiff's accident, he "could not recall anyone from R.C. Fabricators advising him that they were having trouble" positioning the sheet decking on the fourth side of the roof.  (Id. at 8 ¶ 25.)    Nor could Mr. Cornish recall Plaintiff advising of any difficulties with tying off prior to his fall.  (Id. at 8-9 ¶ 26.)   Moreover, R.C. Fabricators' outside consultant, Frank Dobson, did not advise R.C. Fabricators' foreman of any safety concerns or hazards on the project.  (Id. at 9 ¶ 28.)

Dandrea and Greyhawk move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  The Court heard oral argument on the motions on March 4, 2009 and reserved decision at that time.[6]  In support of its motion, Dandrea contends that the construction project had several prime contractors, including R.C. Fabricators, each of whom was responsible for the safety of its employees and implementation of its safety programs.  (Dandrea Br. 16-17.)   Dandrea asserts that "no one from Dandrea Construction,

---

6.   At oral argument, Arthur M. Krawitz, Esquire, and Jeffrey A. Krawitz, Esquire, appeared on behalf of Plaintiff; Jeanine D. Clark, Esquire, appeared on behalf of Dandrea; and Christopher J. Conover, Esquire, appeared on behalf of Greyhawk.

Inc. ever controlled the means or methods by which R.C. Fabricators, Inc. performed its work on the Clark Mickle School Project." (Id. at 10 ¶ 31.) Dandrea further asserts that it "was not responsible for the supervision, coordination or safety procedures" of R.C. Fabricators' employees, and did not have an obligation to directly supervise or control the employees of other prime contractors. (Id. at 17-18, 23.) In addition, Dandrea contends that it "was not contractually obligated to prepare, instruct, inspect or enforce the safety program of R.C. Fabricators," as such plan was submitted to Defendant Greyhawk and "presumably approved." (Id. at 18-19.) According to Dandrea, "[n]o one other than the R.C. Fabricators' foreman and Frank Dobson were responsible for enforcing R.C. Fabricators' safety program and policies at the Clark Mickle School Project." (Id. at 14 ¶ 49.) Moreover, Dandrea contends that no duty may be imposed on it because the injury to Plaintiff was not foreseeable, as Dandrea complied with its safety obligations and could not have known that Plaintiff would unhook himself from the fall protection system in place. (Id. at 20-22.) In the absence of a foreseeable risk and given that Dandrea purportedly had no opportunity to take any action in response to Plaintiff's conduct, Dandrea asserts that it did not owe a duty to Plaintiff. (Id. at 23.) Dandrea also asserts that it was Plaintiff's decision to unhook himself from the fall protection, and not any action or inaction by Dandrea, that was the proximate cause of Plaintiff's fall. (Id. at 25.)

10

Greyhawk asserts that summary judgment is warranted because it did not have a duty of care as to Plaintiff. Greyhawk first argues that a duty of care may not be imposed because Greyhawk could not have foreseen the incident at issue. (Br. in Supp. of Mot. for Summ. J. on Behalf of Def. Greyhawk North America, LLC Pursuant to Rule 56 [Doc. No. 23-10] (hereinafter, "Greyhawk Br.") 7.) Greyhawk's construction manager on site testified that although Greyhawk representatives periodically visited the project, the purpose of such inspections was to evaluate the progress of the overall project and not to monitor safety on the site. (Id. at 9-10) (citing Kurdock Decl., Ex. E.) Greyhawk thus asserts that because it was not monitoring the work at the time of the incident, it could not have foreseen the accident at issue. (Id. at 10.) Greyhawk additionally argues that imposition of a duty would be "grossly unfair" given its role on the project as the landowner's "representative on site with no responsibility as to the direction or implementation of any construction work." (Id. at 9-10.) Greyhawk further notes that it did not employ Plaintiff, enter into a contract with R.C. Fabricators, direct any work on the site where Plaintiff fell, or have any opportunity to correct or eliminate the risk that caused Plaintiff's fall. (Id. at 10.) Greyhawk also asserts that the contract between Dandrea and East Greenwich provides that Greyhawk is "'not responsible for the safety on [the] project but will endeavor to promote safety.'" (Id. at 9) (quoting Kurdock Decl., Ex. C.) In further support of its contention that

11

Greyhawk had no duty to ensure Plaintiff's safety, Greyhawk cites to the Preconstruction Meeting held on October 28, 2004, at which the attendees were purportedly informed that Greyhawk had no responsibility as to safety for the construction project. (Id.) (citing Kurdock Decl., Ex. F.)  Finally, Greyhawk argues that even if a duty was owed to Plaintiff, there are no material issues of fact to show that a breach of such duty by Greyhawk was the proximate cause of Plaintiff's injuries, because Plaintiff's "decision to disconnect his own safety line . . . is in fact the sole cause of this accident."  (Id. at 12.)

In opposition, Plaintiff argues that both Dandrea and Greyhawk owed a duty to Plaintiff because they had day-to-day control over the work at the project and were contractually responsible for site safety.  (Pl.'s Br. in Opp. to the Mot. of Defs. Greyhawk North America, L.L.C., Greyhawk Construction Corp. and Greyhawk Construction for Summ. J. [Doc. No. 34] (hereinafter, "Pl. Br. [Doc. No. 34]") 11-12; Pl. Br. [Doc. No. 35] 13, 15.)  Plaintiff contends that the New Jersey Schools Construction Corporation (hereinafter, "NJSCC") Safety Manual also placed specific safety inspection and enforcement obligations on Greyhawk and Dandrea, including requiring daily safety inspections and remedying safety violations by Greyhawk and requiring Dandrea to develop and approve a site specific health and safety plan and designate an onsite safety coordinator.  (Pl. Br. [Doc. No. 34] 12; Pl. Br. [Doc. No. 35] 14.)  Plaintiff further argues, citing Ryan v. United States,

12

233 F. Supp. 2d 668 (D.N.J. 2002), that Greyhawk's and Dandrea's duty for site safety arises out of a contractual obligation to monitor, inspect and enforce site safety. (Pl. Br. [Doc. No. 34] 13-15; Pl. Br. [Doc. No. 35] 15-16.) Moreover, Plaintiff asserts, citing Carvalho v. Toll Bros. & Developers, 143 N.J. 565 (1996), that Greyhawk's and Dandrea's duty for site safety arises out of their obligations to monitor and control the progress of construction. (Pl. Br. [Doc. No. 34] 16; Pl. Br. [Doc. No. 35] 16-18.) Plaintiff also asserts that the risk of injury was foreseeable, and that Greyhawk and Dandrea failed to discover and enforce correction of the fall restraint systems being utilized by R.C. Fabricators, which allegedly failed to comply with the contract documents for the project and the NJSCC Safety Manual requirements for fall protection. (Pl. Br. [Doc. No. 34] 13, 18, 19; Pl. Br. [Doc. No. 35] 20-21.) Specifically, R.C. Fabricators' written safety plan required fall arrest systems at heights over fifteen feet. (Pl. Br. [Doc. No. 34] 8 ¶ 20.) Plaintiff asserts that the NJSCC Safety Manual required "'site-wide 100% six (6) foot fall protection'" and that the General Conditions of the contract between East Greenwich and Dandrea required "full time fall protection for exposures over 6 feet." (Id. at 7 ¶¶ 18, 19; see also Pl. Br. [Doc. No. 35] 6 ¶ 11, 8 ¶ 20.) With respect to Greyhawk's and Dandrea's assertions that Plaintiff proximately caused his injury when he disconnected his lanyard, Plaintiff argues that the causative effect of Plaintiff's conduct must be

13

balanced against Greyhawk's and Dandrea's alleged breaches of their duty to Plaintiff, which is a question of fact that must be determined by a jury. (Pl. Br. [Doc. No. 34] 20; Pl. Br. [Doc. No. 35] 22.)

A court may grant summary judgment when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56©; see Giles v. Kearney, 571 F.3d 318, 322 (3d Cir. 2009). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." See id. "Factual disputes that are irrelevant or unnecessary will not be counted." Id.

The moving party bears the initial burden of "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once a moving party satisfies its burden, the party opposing summary judgment must then "set forth specific facts showing that there is a genuine issue for trial." Liberty Lobby, 477 U.S. at 248, 106 S.

Ct. 2505, 91 L. Ed. 2d 202.  A non-moving party must present more than "''bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue.''" McCabe v. Ernst & Young, LLP, 494 F.3d 418, 436-37 (3d Cir. 2007)(quotation omitted); see also Liberty Lobby, 477 U.S. at 249-50, 106 S. Ct. 2505, 91 L. Ed. 2d 202.  The Court must view the evidence in a light most favorable to the non-moving party and any "justifiable inferences" shall be extended to the non-moving party.  Liberty Lobby, 477 U.S. at 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202.

In this case, Plaintiff premises his claims against Dandrea and Greyhawk on negligence principles.  The New Jersey Supreme Court has "'recognized generally that a purpose of the tort laws is to encourage reasonable conduct, and, conversely, to discourage conduct that creates an unreasonable risk of injury to others.'" Sciarrotta v. Global Spectrum, 194 N.J. 345, 357, 944 A.2d 630 (2008) (quoting Gantes v. Kason Corp., 145 N.J. 478, 489, 679 A.2d 106 (1996)).  Moreover, "the 'deterrent goal of the tort laws is effectuated through the recognition of a duty to exercise reasonable care and the imposition of liability for the breach of such a duty.'"  Id. (quoting Gantes, 145 N.J. at 489, 679 A.2d 106).  In order to succeed on a claim of negligence under New Jersey law, a plaintiff must establish that the defendant owed the plaintiff a duty of care, that the defendant breached the duty of care, that the defendant's breach was a proximate cause of the plaintiff's harm, and that the plaintiff sustained actual damages.

15

<u>Weinberg v. Dinger</u>, 106 N.J. 469, 474, 524 A.2d 366 (1987)

(citations omitted).[7]  "While in a negligence action the scope of

an alleged tortfeasor's duty is a question of law for the court to

decide, 'the New Jersey courts have demonstrated a strong

---

7.  All parties rely upon New Jersey law in their submissions to
the Court, and no party has addressed or argued application of
any other state law to the motions for summary judgment.
Generally, in an action based upon diversity, the Court applies
the choice of law rules of the forum state.  <u>See</u> <u>Klaxon Co. v.
Stentor Elec. Mfg.</u>, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477
(1941).  New Jersey applies the "most significant relationship"
test and "the corresponding choice of law factors included in the
[Restatement (Second) of Conflict of Laws (1971)] for analysis of
conflict of laws for tort claims."  <u>Clark v. Prudential Ins. Co.
of Am.</u>, No. Civ. A. 08-6197, 2009 WL 2959801, at *5 (D.N.J. Sept.
15, 2009) (citing <u>P.V. v. Camp Jaycee</u>, 197 N.J. 132, 962 A.2d 453
(2008)).  Under this test, the court first examines the
"substance of the potentially applicable laws to determine
whether an actual conflict exists," and if there is no
"distinction between the potentially applicable laws, there is no
choice-of-law issue to be resolved and the court will apply the
law of the forum state."  <u>Id.</u>  In the present case, Plaintiff
alleges in the complaint that he resides in Delaware, that
Dandrea is a New Jersey corporation, and that Greyhawk is a New
York limited liability company.  (Compl. ¶¶ 2-4.)  The laws of
Delaware, New Jersey, and New York are not in conflict on the
personal injury claim in this case.  <u>See</u>, <u>e.g.</u>, <u>Drummond v.
Delaware Transit Corp.</u>, 365 F. Supp. 2d 581, 585 (D. Del. 2005)
("To prevail in a negligence action under Delaware law, a
plaintiff must show, by a preponderance of the evidence, that a
defendant's negligent act or omission breached a duty of care
owed to the plaintiff in a way that proximately caused the
plaintiff's injury.");  <u>Weinberg</u>, 106 N.J. at 474, 524 A.2d 366
("A cause of action founded upon negligence involves a breach of
a duty of care that causes injury.");  <u>Febesh v. Elcejay Inn
Corp.</u>, 555 N.Y.S.2d 46, 47, 157 A.D.2d 102 (N.Y. App. Div. 1990)
("[F]or a plaintiff to establish a cause of action sounding in
negligence, he must meet the initial burden of showing 1) the
existence of a duty flowing from defendant to plaintiff; 2) a
breach of this duty; 3) a reasonably close causal connection
between the contact and the resulting injury; and 4) actual loss,
harm or damage."), <u>appeal</u> <u>denied</u>, 77 N.Y. 2d 801, 567 N.E. 2d 980
(N.Y. 1991).  The states' laws do not differ and, consequently,
there is no conflict.  The Court shall thus apply the law of the
forum state, New Jersey.

reluctance to decide issues of common law negligence as a matter of law.'"  Ellis v. Siemens Enterprise Network, Inc., No. Civ. A. 04-4332, 2008 WL 724278, at *8 (D.N.J. Mar. 17, 2008) (quotations omitted).

The first issue the Court must address is whether either Dandrea or Greyhawk, or both defendants, owed a duty of reasonable care to Plaintiff.  "The question of whether a duty exists is a matter of law properly decided by the court, not the jury. . . ." Wang v. Allstate Ins. Co., 125 N.J. 2, 15, 592 A.2d 527 (1991).  In determining the existence of a duty of reasonable care, a court must consider the foreseeability of harm and other considerations of fairness and policy, including "'the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution.'"  Carvalho v. Toll Bros. & Developers, 143 N.J. 565, 573, 675 A.2d 209 (1996) (quoting Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439, 625 A.2d 1110 (1993)); see also Alloway v. Bradlees, Inc., 157 N.J. 221, 230, 723 A.2d 960 (1999) (determination of existence of duty of care requires consideration of foreseeability of risk of injury, relationship of parties, nature of attendant risk, opportunity and ability to exercise care, and public interest in proposed solution).  "The analysis leading to the imposition of a duty of reasonable care is 'both fact-specific and principled,' and must satisfy 'an abiding sense of basic fairness under all of the circumstances in light of

17

considerations of public policy.'" Alloway, 157 N.J. at 230, 723 A.2d 960 (citations omitted).

Plaintiff relies on Carvalho in arguing that both Dandrea and Greyhawk owed a duty of care to Plaintiff. In Carvalho, the issue was whether a project engineer, who was required to provide an on-site inspector to monitor the progress of construction work, owed a duty of care to a laborer who was killed when a trench in which he was working collapsed. Carvalho, 143 N.J. at 569, 675 A.2d 209. The New Jersey Supreme Court, in considering the foreseeability of the risk, noted that the risk of injury to the plaintiff was foreseeable because trenches had collapsed on several occasions during construction. Id. at 574, 675 A.2d 209. The New Jersey Supreme Court also noted that the engineer's contractual obligation to ensure compliance with the construction plans and the rate of work implicated safety concerns. Id. at 575, 675 A.2d 209. Furthermore, the engineer, through its inspector, was on the job site every day, observed the work in the trench, had actual knowledge of the dangerous condition, and had sufficient control to halt work until adequate safety measures were taken. Id. at 577-78, 675 A.2d 209. The New Jersey Supreme Court concluded that under these circumstances, considerations of fairness and public policy required imposing upon the engineer a duty of care to the worker. Id. The New Jersey Supreme Court thus affirmed the Appellate Division's reversal of the trial court's grant of summary judgment in favor of the engineer. Id. at 572, 579, 675 A.2d 209.

18

The New Jersey Supreme Court also considered the duty of care owed to a worker on a construction site in <u>Alloway</u>, where an employee of a subcontractor providing crushed stone to a general contractor was injured as a result of a defective mechanical component of a dump truck. <u>Alloway</u>, 157 N.J. at 225, 723 A.2d 960. In reversing the Appellate Division's affirmance of the trial court's grant of summary judgment in favor of the general contractor, the New Jersey Supreme Court concluded that the general contractor owed a duty of care to the subcontractor's employee. <u>Id.</u> at 233, 241, 723 A.2d 960.  In particular, the New Jersey Supreme Court found that the risk of injury was foreseeable because the general contractor knew that the truck was defective and had attempted to repair the defective mechanism on the day prior to the accident, and thus had actual knowledge of the risk of harm.  <u>Id.</u> at 232, 723 A.2d 960.  Furthermore, the New Jersey Supreme Court noted that the relationship between the parties implicated workplace safety concerns and created the opportunity and capacity to exercise authority and control over the equipment.  <u>Id.</u> at 232-33, 723 A.2d 960.  Given the foreseeability of the harm, the relationship between the parties, and the opportunity and capacity to take corrective action, the New Jersey Supreme Court found as a matter of fairness and public policy that the general contractor had a duty of reasonable care to assure the safety of the plaintiff on the work site.  <u>Id.</u> at 233, 723 A.2d 960.  <u>But</u> <u>see</u> <u>Bennett v. Cedar Brook Corp.</u>, No. Civ. A-3636-02T5, 2004 WL 1557486, at *2

(N.J. Super. Ct. App. Div. June 11, 2004) (where plaintiff, employee of subcontractor, was injured on construction project while fashioning pipe hangar into missing tool by flattening it with hammer, court held general contractor did not owe duty of care to plaintiff because risk of injury was not foreseeable, as plaintiff "was doing a job that, if correctly performed, did not require safety glasses or even a hammer," fact that tool was absent was not known to anyone else on job site, and plaintiff's employer, not general contractor, failed to provide usable safety glasses); Slack v. Whalen, 327 N.J. Super. 186, 194, 742 A.2d 1017 (N.J. Super. Ct. App. Div. 2000) (property owners who assumed control over construction project had no duty to employee of contractor to exercise reasonable care for employee's safety at work site, because property owners had no contractual agreement to supervise the work or provide safety oversight, were not required to be on site, did not participate in means or method of work being performed, were unaware of methods plaintiff was utilizing, and knew nothing of risk of harm plaintiff created, and thus risk of harm was not sufficiently foreseeable to justify imposing a duty of reasonable care on property owners), cert. denied, 163 N.J. 398, 749 A.2d 371 (2000).

The Court first examines the foreseeability of the risk of injury. Dandrea contends that Plaintiff's accident was not a "reasonably foreseeable consequence" of Dandrea's scope of work, because Plaintiff's "sudden decision to unhook himself" was not

reasonably foreseeable.  (Dandrea Br. 21-22.)   Greyhawk argues
that it could not reasonably foresee the subject accident because
it "merely served as the land owner's representative on site with
no responsibility as to the direction or implementation of any
construction work."  (Greyhawk Br. 8-9.)   Given its role on the
work site, Greyhawk asserts that it was "not monitoring the work
taking place at the time of the incident" and thus purportedly
"could not foresee plaintiff's fall[.]"  (Id. at 10.)

     In considering whether the risk of injury was foreseeable, the
Court looks to the "'likelihood of the occurrence of a general type
of risk rather than the likelihood of the occurrence of the precise
chain of events leading to the injury.'"  Wärtsilä NSD N. Am., Inc.
v. Hill Int'l, Inc., 342 F. Supp. 2d 267, 281-82 (D.N.J. 2004)
(quoting Suchomajcz v. Hummel Chem. Co., 524 F.2d 19, 28 n.8 (3d
Cir. 1975)); see also McGovern v. City of Jersey City, No. Civ. A.
98-5186, 2006 WL 42236, at *17 (D.N.J. Jan. 6, 2006)
("'Foreseeability does not depend on whether the exact incident or
occurrences were foreseeable.  The question is whether an incident
of that general nature was reasonably foreseeable.'") (quoting
Cassanello v. Luddy, 302 N.J. Super. 267, 275, 695 A.2d 325 (N.J.
Super. Ct. App. Div. 1997)).

     The Court finds that it was foreseeable to both Dandrea and
Greyhawk that the adjacent flat roof that lacked perimeter fall
protection presented a risk of injury to a construction worker
working on the project.  While Dandrea argues that it was not

21

foreseeable that a worker on the project would detach his safety protection, this argument does not obviate the imposition of a duty; rather, it applies to issues of causation. Greyhawk's argument that it was not present on the project at the time of the incident is also flawed, because foreseeability addresses a risk of general harm. There is no dispute that both Dandrea and Greyhawk agreed to monitor site safety. In particular, the Project Manager's Report of the Preconstruction Meeting on October 28, 2004 states that "Greyhawk's Regional Safety Manager will conduct periodic site safety inspections and will issue a report on the conditions." (Wolf Decl. II, Ex. D, Section 1.22.) Dandrea's obligation to monitor site safety is set forth in Addendum No. 2 to its contract with East Greenwich, which provides that "[t]he Contractor for General Construction (General Contractor) will serve as the overall Project Safety Coordinator and shall be responsible for all issues of safety and protection." (Wolf Decl., Ex. E.)

None of the parties defines the work site at issue in this case. The contracts between East Greenwich and R.C. Fabricators, and East Greenwich and Dandrea define the "Project," by name and location, as follows: "Additions and Renovations to Jeffrey Clark and Samuel Mickle Schools, Kings Highway and Quaker Road, East Greenwich Township, Mickleton, New Jersey 08056." (Dandrea Mot., Exs. C, E.) Likewise, the contract between East Greenwich and Greyhawk defines the "Project" as ". . . $11 million additions/renovations to Jeffrey Clark and Samuel Mickle Schools

22

per January 2004 referendum." (Wolf Decl. II, Ex. B.) Neither Dandrea nor Greyhawk contends that the area for the work site for the "Project" included only the addition to the Jeffrey Clark School and not the adjacent existing school building onto which Plaintiff stepped while maneuvering a sheet of corrugated metal.[8] Viewing the evidence in a light most favorable to Plaintiff, the Court concludes at this time that the work site included the adjacent existing roof, as there is no evidence submitted that this area was excluded from the "Project" or that the workers were restricted from the flat roof. Nor is there any dispute that the roof of the adjacent existing school building was not protected by a "guardrail system for fall prevention," a "safety net system below the unprotected and unguarded perimeter sides and ends," or a "ground supported fabricated frame scaffold (tubular welded frame scaffold)" for fall prevention. (Wolf Decl., Ex. D (Knoll Deposition Transcript) 28:6-14; Ex. I (Hopkins Report) 4-5.)

The Court also looks to the relationship of the parties in determining the existence of a duty. In addressing this factor,

8. In fact, Plaintiff's expert described the area where Plaintiff fell as follows: "Between two existing school buildings' side sloped and end hip roof and the new addition school building's end hip roof, there was a flat section of roof that was shaped like an L over a breezeway. The bottom leg of the L was approximately one foot to one and a half feet below the new building's end hip roof and was attached to the new building's end wall. The bottom leg of the L was shorter than the width of the new building and was less than half the width of the vertical leg of the L. The vertical leg of the L was between and attached to two existing school buildings and was between six (6) and eight (8) feet wide." (Wolf Decl., Ex. I (Hopkins Report) 3.)

Dandrea asserts that it was "not contractually obligated to prepare, instruct, inspect or enforce the safety program of R.C. Fabricators[.]" (Dandrea Br. 18.)  Dandrea further argues that in addition to having no contractual obligation, "there has been no evidence" that it undertook a duty to ensure that the safety plans of other prime contractors were being enforced.  (Id. at 19.) Dandrea contends that its only responsibilities with respect to site safety "involved those set forth in the General Conditions" and are limited to the responsibilities required by OSHA.  (Id. at 20.)  Greyhawk does not specifically address whether the relationship of the parties supports the imposition of a duty on Greyhawk.

The Court finds that the relationship between Dandrea and East Greenwich supports the imposition of a duty upon Dandrea.[9]  While Dandrea argues that it had "no contractual obligation and engaged in no voluntary undertaking which would impose on it an obligation to enforce the safety program of R.C. Fabricators" (Dandrea Br. 20), Section 10.2 of the General Conditions of the contract with East Greenwich provides that Dandrea, as one of the prime

_____

9.  In examining the relationship of the parties, the Court notes that in Carvalho and Alloway, the New Jersey Supreme Court considered the relationship of the parties involved in the construction project.  See Carvalho, 143 N.J. at 574, 675 A.2d 209 (noting that "the relationship of the parties was contractual" in light of contract between project owner and defendant-engineer); Alloway, 157 N.J. at 232-33, 723 A.2d 960 (finding "substantial and close relationship between the parties" where general contractor engaged subcontractor, and principal of subcontractor was also superintendent of general contractor).

contractors, must "take reasonable precautions for safety of, and shall provide reasonable protection to prevent damage, injury or loss to . . . employees on the Work and other persons who may be affected thereby[.]" (Dandrea Mot., Ex. G.)  Moreover, Addendum No. 2 to the General Conditions expressly states that the "Contractor for General Construction (General Contractor) will serve as the overall Project Safety Coordinator and shall be responsible for all issues of safety and protection." (Wolf Decl., Ex. E.)[10]  Dandrea asserts that its obligation for overall site safety and coordination did not extend to "direct supervision or control of the employees of the other prime contractors[.]" (Dandrea Br. 18.)  While Dandrea may not have a duty to control the means and methods of the work of R.C. Fabricators' employees, as Plaintiff asserts, Dandrea had a non-delegable duty for overall site safety at the project.  See Kane v. Hartz Mountain Indus., Inc., 278 N.J. Super. 129, 142 (holding that general contractor and subcontractor for erection of structural steel "each had a non-delegable duty to maintain a safe workplace.").  Through its contract with East Greenwich, Dandrea expressly agreed to oversee safety as to all issues.  See O'Keefe v. Sprout-Bauer, Inc., 970 F.2d 1244, 1257 (3d Cir. 1992) (contractor who entered into contract to "be responsible for initiating, maintaining and

---

10.  Dandrea does not dispute that this addendum to the General Conditions was incorporated into its contract with East Greenwich.  Dandrea's expert acknowledges that this addendum was incorporated into the contract.  (Dandrea Mot., Ex. Q (Parr Report) 3.)

supervising all safety precautions and programs" and to "provide the necessary protection to prevent damage, injury or loss to . . . all employees on the Work" agreed to "assume a duty to protect the subcontractors' employees[.]"). Though each prime contractor, pursuant to Addendum No. 2, was also "responsible for the safety of their work and for their workers and to make continuous inspections for all safety issues relating to his work," this obligation did not abrogate Dandrea's responsibilities for "all issues of safety and protection[,]" including Dandrea's obligation to ensure overall site safety. (Wolf Decl., Ex. E.)

With respect to Greyhawk, no party has provided the Request for Proposal, which, according to "Attachment A" to the contract between East Greenwich and Greyhawk, defines the scope of services to be provided by Greyhawk for the project. (See Wolf Decl. II, Ex. B.) The only documents that define Greyhawk's responsibilities are the Standard Form of Agreement Between Owner and Construction Manager, "Attachment A" to the contract setting forth Greyhawk's "typical services," and the Project Manager's Report of the Preconstruction Meeting held on October 28, 2004. (Wolf Decl. II, Exs. B, D.) The report of the Preconstruction Meeting is replete with entries in which Greyhawk disclaims responsibility for safety on the work site. However, it is apparent from the documents provided that the relationship between East Greenwich and Greyhawk "contemplated the active participation and involvement by [Greyhawk] in the construction work at the site." Carvalho, 143

26

N.J. at 574, 675 A.2d 209.  Like the engineer in Carvalho, in this case Greyhawk was hired to monitor the progress of the work. (Kurdock Decl., Ex. E (Lauria Deposition Transcript) 11:15-12:5.) Greyhawk's construction manager was at the construction site every day to monitor the progress of the work.  (Id. at 16:15-17.) Moreover, the Project Manager's Report of a Preconstruction Meeting held on October 28, 2004 indicates that "Greyhawk's Regional Safety Manager will conduct periodic site safety inspections and will issue a report on the conditions," and further indicates that if Greyhawk realized that an unsafe condition existed, it would provide notification of the condition to the contractor.  (Wolf Decl. II, Ex. D, Section 1.22.)  Thus, Greyhawk's "supervisory responsibility necessarily entailed the observation of existing conditions and the actual performance of the work undertaken by the workers at the site."  Carvalho, 143 N.J. at 574, 675 A.2d 209. Moreover, as was the case in Carvalho, "[m]atters of construction-site safety did bear indirectly on [Greyhawk's] contractual responsibility for supervising the progress of the work" because "an accidental injury or death on the work site because of the failure to take safety measures would directly affect the progress of the work by bringing it to a halt."  Id. at 575, 675 A.2d 209. Under these circumstances, the Court finds that the relationship between Greyhawk and East Greenwich supports the imposition of a duty on Greyhawk.

     With respect to the opportunity and capacity to avoid the risk

of harm, Dandrea argues that although it had an obligation for "overall site safety and coordination," the obligation "did not extend to the direct supervision or control" of R.C. Fabricators' employees, and it was thus R.C. Fabricators, rather than Dandrea, who was "in the best position to oversee the safety" of its employees. (Dandrea Br. 17-18.)  R.C. Fabricators purportedly had the expertise to determine the appropriate location for tie-up points, and was responsible for locating and setting up the tie-up points for the fall protection system. (Id. at 18.)   Moreover, Dandrea contends that Plaintiff was the only individual in a position to prevent the accident because it was his unilateral decision to unhook himself from the safety equipment he had been using at the project.  (Id. at 18.)  According to Dandrea, "as Plaintiff suddenly made the unilateral decision to unhook," he deprived Dandrea "of any opportunity to have taken any action" in response to Plaintiff's conduct.  (Id. at 23.)  Greyhawk asserts that it did not have an opportunity to avoid the risk of harm because it had no role in designing the "safety apparatus of plaintiff's employer" and was not notified of any concerns regarding the project, and because Plaintiff disconnected his safety line approximately forty minutes prior to his fall, in violation of his company's safety policy, and without any notice to R.C. Fabricators' foreman or any other entity. (Greyhawk Br. 11.)

The Court concludes that Dandrea's opportunity and capacity to avoid the risk of harm weighs in favor of finding a duty of care.

28

With respect to Dandrea's assertion that it did not have an obligation to directly supervise or control other prime contractors' employees (Dandrea Br. 17-18), this argument does not address the issue of whether Dandrea had a duty of overall site safety, including ensuring that there was fall protection on the existing flat-roofed area that abutted the new roof being installed.  The General Conditions required a full time fall protection plan for exposures over 6'-0" (Pl. Br. [Doc. No. 35] 6 ¶ 11; Wolf Decl., Ex. E), and, as noted supra, there is no dispute that the flat roof of the existing building -- which was more than six feet above ground -- lacked perimeter fall protection. Dandrea's superintendent for the project, Charles Knoll, was on the project site every day (Wolf Decl., Ex. D (Knoll Deposition Testimony) at 13:8-11) and, inferably, observed the lack of perimeter fall protection on the flat roof of the existing school building.  Dandrea thus, inferably, had actual knowledge that the flat roof lacked perimeter fall protection. See Carvalho, 143 N.J. at 577-78, 675 A.2d 209 ("the engineer, through its inspector, was on the job site every day, observed the work in the trench, and, inferably, had actual knowledge of the dangerous condition."). Furthermore, Dandrea was obligated to resolve "all safety and environmental complaints/issues" raised by employees of other prime contractors. (Wolf Decl., Ex. E.)  Moreover, it is undisputed that if Mr. Knoll observed an unsafe condition at the work site, he could direct the contractor to correct the condition.  (Pl. Br.

[Doc. No. 35] 7 ¶ 15.)   It is also undisputed that Mr. Knoll testified that he could stop work at the site if he observed a safety violation.  (Id. at 7 ¶ 17.)   Thus, had the existing flat roof been identified as a safety concern, Dandrea had the capacity and obligation, as part of its duty of reasonable care for the safety of persons who could reasonably be expected to come to the work site, to ensure correction of such a condition.

The Court similarly finds that Greyhawk's opportunity and capacity to avoid the risk of harm weighs in favor of finding a duty of care.   It is undisputed that Greyhawk's construction manager, James Lauria, testified that he was at the construction site for the project every day.  (Pl. Br. [Doc. No. 34] 4 ¶ 7.) Therefore, he inferably observed that the flat roof of the existing school building lacked perimeter fall protection, and Greyhawk, inferably, had actual knowledge of the condition.  See Carvalho, 143 N.J. at 577-78, 675 A.2d 209.  Mr. Lauria further testified that Greyhawk had the authority to stop work at the project if he observed something "being done in an unsafe manner." (Id. at 5 ¶ 9.)   Furthermore, the report of the Preconstruction Meeting on October 28, 2004 indicates that Greyhawk would "conduct periodic site safety inspections" and could require prime contractors to correct any unsafe conditions that existed. (Wolf Decl. II, Ex. D, Section 1.22.)   Consequently, had the existing flat roof been identified as a safety concern, while Greyhawk may not have had a contractual obligation to take corrective measures, it had the

30

opportunity and capacity, as part of its duty of reasonable care for the safety of persons who could reasonably be expected to come to the work site, to ensure correction of the condition.

Based on the foreseeability of harm, the relationship of the parties, actual knowledge that the flat roof of the existing school building lacked perimeter fall protection, and the opportunity and capacity of both Greyhawk and Dandrea to take corrective action,[11] the Court concludes that there are sufficient indicia to warrant the imposition of a duty of reasonable care on Dandrea and Greyhawk as a matter of fairness and public policy.[12]

The Court next addresses the assertions by Defendants that they did not breach any duty of reasonable care to Plaintiff. Plaintiff asserts that Dandrea breached its duty of care by failing to observe, report upon or require correction of R.C. Fabricators' safety violations, and by failing to provide adequate fall protection systems.  (Pl. Br. [Doc. No. 35] 20.)  Specifically,

---

11.  No party has addressed the public interest in whether to impose a duty upon Dandrea and Greyhawk in this case.  However, the Court notes that safety plans were submitted to Greyhawk and that Dandrea was responsible for overall site safety.  While the Court does not hold that defendants had a duty to supervise the work of the employees of R.C. Fabricators, imposing a duty of reasonable care to Plaintiff as set forth herein is consistent with the holdings of Carvalho and Alloway.

12.  Plaintiff also cites Ryan v. United States, 233 F. Supp. 2d 668 (D.N.J. 2002), in support of his argument that Dandrea and Greyhawk owed a duty to Plaintiff.  Having concluded that Defendants have a duty of care under Alloway and Carvalho, the Court need not address Plaintiff's alternative argument that Dandrea and Greyhawk had a contractual duty as set forth in Ryan, although the Court notes that the contractual relationship of the parties weighs in favor of the imposition of a duty, as set forth supra.

Plaintiff contends that Dandrea did not enforce compliance with the 100% 6-foot fall protection requirement set forth in Addendum No. 2 of its contract with East Greenwich and the NJSCC Safety Manual. (Id. at 20-21.)   Moreover, according to Plaintiff's expert, Kathleen Hopkins, Dandrea's purported "lack of adequate and effective safety inspections" resulted in a failure to detect OSHA violations.   (See id. at 11.)   Plaintiff further argues, citing the deposition testimony of John Dandrea, that Dandrea failed to develop or approve a site specific health and safety plan and failed to designate a safety coordinator for the project.   (Id. at 20.)   With respect to Greyhawk, Plaintiff contends that Greyhawk failed to "monitor site safety, find safety violations, and direct any non-compliant contractor to remedy safety violations."   (Pl. Br. [Doc. No. 34] 18-19.)   Plaintiff asserts in particular that Greyhawk approved R.C. Fabricators' Safety Policy, notwithstanding that such policy "ran contrary to the NJSCC Safety Manual mandated 6 foot fall protection requirement," and did not require R.C. Fabricators to correct its non-compliance with the site-wide six foot fall protection requirement.   (Id. at 8.)

In determining whether there was a breach of duty, the Court looks to whether there was a violation of the Occupational Health and Safety Act (hereinafter, "OSHA") or other legislated standard of conduct.   As the New Jersey Supreme Court noted in Alloway, while "the violation of OSHA regulations without more does not constitute the basis for an independent or direct tort remedy[,]"

the violation of a "legislated standard of conduct may be regarded as evidence of negligence[.] . . . ." <u>Alloway</u>, 157 N.J. at 236, 723 A.2d 960.   Thus, "[f]acts that demonstrate an OSHA violation constitute evidence of negligence that is sufficient to overcome a motion for summary judgment." <u>Id.</u> at 240-41, 723 A.3d 960 (citations omitted).   However, "'[c]ompliance with an OSHA regulation does not in and of itself preclude a finding of negligence,' and, conversely, non-compliance with an OSHA regulation does not, as such, preclude a finding that there was no negligence." <u>Id.</u> at 237, 723 A.2d 960 (quotation omitted).

The OSHA standard governing fall protection for individuals involved in steel erection activities generally is set forth in 29 C.F.R. § 1926.760.   Under this section, generally, "each employee engaged in a steel erection activity who is on a walking/working surface with an unprotected side or edge more than 15 feet (4.6 m) above a lower level shall be protected from fall hazards by guardrail systems, safety net systems, personal fall arrest systems, positioning device systems or fall restraint systems." 29 C.F.R. § 1926.760(a)(1).[13]   The criteria for fall protection

_____

13. Plaintiff's expert, Kathleen Hopkins, opines that the applicable sections of OSHA are 29 C.F.R. § 1926.501(b)(1), (6), and § 1926.503, which are contained in Subpart M of the OSHA regulations.  (Wolf Decl., Ex. I (Hopkins Report) 8-9.) Defendants' experts assert that these sections are not applicable to the work being performed by Plaintiff because OSHA contains a more specific set of regulations for steel erection activities, which are contained in a separate subpart, Subpart R.  (<u>See</u> Dandrea Mot., Ex. Q (Parr Report) 12; Greyhawk's Letter Reply Br. dated Feb. 2, 2009, Ex. A (Szautner Report) 8.)  It appears, however, that Ms. Hopkins relied on Subpart M of OSHA because she construed the flat roof of the existing school building as

equipment are set forth in 29 C.F.R. § 1926.502.  See 29 C.F.R. § 1926.760(d)(1).  A personal fall arrest system must satisfy twenty-four criteria, including, inter alia, that lanyards and vertical lifelines have a minimum breaking strength of 5,000 pounds, that ropes and straps used in lanyards, lifelines and strength components of body belts and body harnesses be made from synthetic fibers, and that anchorages used for attachment of personal fall arrest equipment be capable of supporting at least 5,000 pounds per employee attached, or be used under the supervision of a qualified person and be designed, installed and used as a part of "a complete personal fall arrest system which maintains a safety factor of at least two[.]"  29 C.F.R. § 1926.502(d).

As noted above, Plaintiff asserts that notwithstanding OSHA's fifteen-foot fall protection requirement, the project documents and the NJSCC Safety Manual required contractors on the project site, including contractors for steel erection, to implement a site-wide 100% six (6) foot fall protection policy.  In particular, the NJSCC Safety Manual provides that "[t]he contractor shall implement a site-wide 100% six (6) foot fall protection policy.  This shall include all types of scaffolding and steel erection." (Wolf Decl., Ex. G, Section R-2.)[14]  The contracts between East Greenwich and

_____

walkway on the work site that might be traversed by construction workers in the course of construction.  (See Wolf Decl., Ex. I (Hopkins Report) 8-9.)

14.  The NJSCC Safety Manual submitted by the parties does not define the specific requirements for fall protection.  Section M-2 of the NJSCC Safety Manual provides that "[f]all prevention controls shall be based on the principles established by engineering and design techniques for elimination and prevention

Dandrea, and East Greenwich and R.C. Fabricators also address fall protection, as Addendum No. 2 to the General Conditions provides that "[e]ach Prime Contractor must submit an acceptable O.S.H.A. compliant site specific written safety plan to Greyhawk . . . [which] safety plan shall include (as applicable to their work) but is not limited to the following: . . . Full time fall protection plan for exposures over 6'-0"." (Wolf Decl., Ex. E.)[15]   While Greyhawk does not address the applicability of the NJSCC Safety Manual, Dandrea argues that the requirements of the NJSCC Safety Manual do not apply to the project at issue in this case because Dandrea "had no contractual relationship with the NJSCC" and thus was not a "'contractor/general contractor' as defined by the NJSCC." (Dandrea Br. 17.)[16]   Neither Dandrea nor Greyhawk addresses

_____

of fall hazards[.] . . . When it is not feasible to provide fall prevention controls, workers exposed to falls shall be provided with and use a full body harness, retractable lanyards, lanyards with shock absorbers, and anchorage points as specified per OSHA standards (29 CFR 1926 Subpart M)." (Wolf Decl., Ex. G, Section M-2.)

15.   This provision in Addendum No. 2 appears internally inconsistent, because an OSHA compliant plan would require full time fall protection for exposures over fifteen feet, rather than six feet, for steel erection activities. See 29 C.F.R. § 1926.760.

16.   The contract between Dandrea and East Greenwich specifically stated that Dandrea "agrees to comply with all applicable governmental laws and regulations including, but without limitation . . . the Schools Construction Corp. requirements." (Wolf Decl., Ex. B at § 7.6.)  Moreover, Dandrea's expert noted that "the contract conditions and instruction to bidders required that all contractors conform to the requirements of the NJSCC[.]" (Dandrea Mot., Ex. Q (Parr Report) 7.)  Although there is no similar provision in the contract between East Greenwich and Greyhawk, Greyhawk does not dispute Plaintiff's assertions in its Statement of Material Facts that the NJSCC Safety Manual "applies

the requirement in the project documents that fall protection be implemented at six feet.

The Court shall deny summary judgment in favor of Dandrea and Greyhawk because there are material questions of fact as to whether either defendant breached the duty of care owed to Plaintiff. Specifically, there are factual disputes as to whether fall protection was required on the existing school roof, whether fall protection, if required, was in fact provided, and, if fall protection was required but not provided, whether Dandrea's and/or Greyhawk's failure to ensure that fall protection was provided constitutes a breach of their duty to Plaintiff. There is no dispute that the roof of the existing school building was approximately twelve feet, six inches above the ground. (Dandrea Mot., Ex. Q (Parr Report) 5; Wolf Decl., Ex. I (Hopkins Report) 3; see also Greyhawk's Letter Reply Br. dated Feb. 2, 2009 [Doc. No. 42], Ex. A (Szautner Report) 3.)   Therefore, whether fall protection was required on the roof of the existing school building turns, in part, on whether Subpart R of OSHA, which requires fall protection at fifteen feet for steel erection activities, applies, or whether the more stringent standard set forth in Subpart M of OSHA, the NJSCC Safety Manual, and the project documents, which

_____

to Work performed on any School Facilities Project, such as the Project at issue" and that "Greyhawk's work was also controlled by and subject to all NJ School Construction Corp. . . . requirements applicable to the Project, including the NJ Schools Construction Corporation Safety Manual[.]"  (Pl. Br. [Doc. No. 34] 5-6 ¶¶ 13, 14.)

require fall protection at six feet, applies.[17]  Given the differing
requirements imposed by OSHA, the NJSCC, and the contract
documents, the Court cannot decide on the record submitted which
standard applies in this case.[18]  Furthermore, on the record before
the Court, it is not clear whether Plaintiff was able to reach the
flat roof of the adjacent existing school building with the
lifeline provided.  Plaintiff testified that he detached his
retractable line from the anchor point because it would have
"inhibited" him from performing his job and posed a physical threat
given the manner in which he needed to maneuver the piece of
decking.  (Dandrea Mot., Ex B (Jones Deposition Transcript) 82:17-
24, 84:9-85:9.)  Plaintiff did not testify that his retractable
line was not long enough to allow him access to the area he was
working.  However, Defendants do not provide any evidence

---

17.  While Dandrea argues that it was not required to comply with
the NJSCC Safety Manual because it was not a "contractor" as
defined therein, there is no dispute that Dandrea's contract with
East Greenwich specifically stated that Dandrea "agrees to comply
with all applicable governmental laws and regulations including,
but without limitation . . . the Schools Construction Corp.
requirements."  (Wolf Decl., Ex. B at § 7.6.)

18.  Cf. Alloway, 157 N.J. at 236, 240-41 (violation of
"legislated standard of conduct may be regarded as evidence of
negligence" and "[f]acts that demonstrate an OSHA violation
constitute evidence of negligence that is sufficient to overcome
a motion for summary judgment."); see also Reyes v. Egner, 404
N.J. Super. 433, 458, 962 A.2d 542 (N.J. Super. Ct. App. Div.
2009) ("Although we do not, and need not, recognize a private
cause of action here stemming from any construction code
violations, we are satisfied that such violations may be
evidential if not conclusive of the lessors' potential breach of
a duty concerning the handrail.  Such an approach conforms with
established precedents treating statutory or regulatory
violations as non-dispositive proof of negligence."), cert.
granted, 199 N.J. 130, 970 A.2d 1047 (2009).

demonstrating that Plaintiff was able to access the flat roof of the existing building with the lifeline he had been provided. Viewing the evidence in a light most favorable to Plaintiff, a question of fact remains as to whether the lifeline provided fall protection while Plaintiff was located on the roof of the existing building. Consequently, the Court concludes that there are triable issues of fact as to whether Dandrea or Greyhawk breached their duty of care.

The Court also finds that triable questions of fact exist as to whether Plaintiff's injuries were proximately caused by a breach, if any, of Dandrea's and/or Greyhawk's duties. "New Jersey courts have held that except for in cases with 'highly extraordinary consequences,' questions 'of proximate cause are jury questions.'" Ellis, 2008 WL 724278, at *8 (quotations omitted). Plaintiff, citing the report of Marlin E. Buckley, argues that both Defendants' failure to supervise safety and eliminate unsafe working conditions, as purportedly required by their contracts with East Greenwich, were causes of Plaintiff's accident. (Pl. Br. [Doc. No. 34] 9-10 ¶ 29; Pl. Br. [Doc. No. 35] 11 ¶ 35.) The Hopkins Report submitted by Plaintiff attributes Plaintiff's fall to a number of causes, including the failure to provide a guardrail system, a safety net system, a proper anchorage point, or a scaffold, the lack of "proper, adequate and effective safety inspections of the roofing construction," the lack of a "proper, adequate and effectively implemented and enforced Safety and Health

38

Program," the lack of "adequate and competent supervision and control of the construction site," and the lack of "proper, adequate and effective safety preplanning[.] . . ." (Wolf Decl., Ex. I (Hopkins Report) 4-5.)  Thus, while there is no dispute that Plaintiff disconnected his safety line, viewing the evidence in a light most favorable to Plaintiff, there are numerous potential causes that also may have caused and/or contributed to Plaintiff's injury.  Consequently, the Court concludes that the issue of whether Plaintiff's actions were the sole cause or a contributing cause of his injury must be determined by the trier of fact.  <u>See</u>, <u>e.g.</u>, <u>Lopez v. Roscio</u>, No. Civ. A. 03-1770, 2006 WL 319294, at *7 (D.N.J. Feb. 10, 2006) (where employee of subcontractor was injured by electrical wires left exposed on worksite by another subcontractor, court denied general contractor's motion for summary judgment because "[c]ausation and comparative liability amongst [general contractor and subcontractors] must be flushed out at trial."); <u>White v. Newark Morningstar Ledger</u>, 245 N.J. Super. 606, 586 A.2d 341 (N.J. Super. Ct. Law Div. 1990) (finding factual issue as to whether defendant's negligence was "a cause or the sole cause" of plaintiff's injury).

Because the Court finds triable questions of fact as to whether Defendants Dandrea and Greyhawk breached a duty owed to Plaintiff, and whether such breaches, if any, were a cause of

Plaintiff's injury, both Defendants' motions for summary judgment are denied.

    An appropriate Order shall be entered.


                    s/ Ann Marie Donio
                    ANN MARIE DONIO
                    UNITED STATES MAGISTRATE JUDGE

Dated: September 30, 2009